## Smith, et al. v. Wathen.

## Wathen v. Smith, et al.

(Decided January 15, 1914.)

## Appeals from Union Circuit Court.

1. Waters—Drainage of Land Into Natural Stream.—Adjoining land owners have the right to drain their land so as to cause the surplus water that falls on their land to flow by artificial drainage into a natural stream of water that runs through the body of land drained, and this they have the right to do by tile or open drainage.

2. Waters—Levees That Obstruct Natural Flow of—Diversion of Water.—While the land owner may by artificial drainage cause the surface water that comes on his land to be diverted into a natural stream, he may not put up levees along the drainage that will divert the water to the land of adjoining proprietors.

3. Waters—Right of Proprietors to Control Surface Waters.—The owner of the lower ground has no right to erect embankments that will cause the water from the upper ground to back upon and overflow it, nor has the owner of the upper ground the right to make excavations or barriers or drains by which the flow of surface water will be diverted from its natural channel and thrown on adjoining proprietors.

4. Waters—Drainage—Ditches—Levees.—Where a system of drainage by open ditches has been established, the dirt, in making the ditches or in cleaning them out, may be thrown on the lower side of the ditch so as to form a levee, but there must be openings left in the levee, level with the surface of the ground, sufficiently close to each other and wide enough to prevent the levees from obstructing the flow of the surface water.

H. D. ALLEN, L. C. FLOURNOY and A. O. STANLEY for Smith.

DRURY & DRURY and MORTON & MORTON for Wathen.

G. T. BERRY for Union County.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing on both appeals.

W. T. Wathen as plaintiff brought this suit against E. R. Smith, Mrs. E. R. Smith, Mrs. C. F. Clements. the Illinois Central Railroad Company and Union County, to recover damages for their alleged wrongful acts in casting upon his land water that would not naturally flow upon it. For convenience Wathen will hereafter be styled the plaintiff and the defendants will be styled defendants.

In a general way the conditions that brought about the litigation may be described as follows: In Union County there is a very fertile valley known as the Lost Creek Valley, that is, at the place where the lands in question are situated, about thirty-five hundred feet wide. Through this valley there runs a natural water course called Lost Creek, the valley on the east side of Lost Creek being about seven hundred feet wide and on the west side about eighteen hundred feet wide. This creek runs in what may be called a northerly direction, and its course being the lowest point in the valley it furnished, in the natural order of things, drainage for the valley. The plaintiff owns a large body of land on the east side of this creek and also fifty acres on the west side, separated from his land on the east side by Lost Creek. The lands of the individual defendants are on the west side of the creek, and excepting the fifty acres of land owned by plaintiff on the west side of the creek, the lands of the plaintiff and defendants are separated by Lost Creek.

For the purpose of making this rich valley, which covers quite a large territory, tillable, the land owners found it necessary to drain it by ditch or tile drainage, these drains running from the foot of the hills that border the valley into Lost Creek. As a result of this system of drainage the valley has been reclaimed and converted into a body of highly productive land.

In carrying out this system of drainage, three open ditches were made across the lands of the individual defendants from the highlands into Lost Creek, into which they emptied. These ditches are very large, and in making and cleaning them out it has been the custom to throw the dirt on the lower side of the ditches, thus making levees along the side of the ditches. In 1909 the plaintiff brought this suit against the defendants to recover damages for injury to his land and crops on the east side of Lost Creek, averring that the erection of the levees by the defendants along the ditches through their lands on the west side of Lost Creek obstructed the natural flow of the water down the valley and threw that part of it that would naturally flow on the west side of Lost Creek across this creek and over his land on the east side of the creek.

The theory upon which the suit was predicated is that except for these levees the large body of water that flows down this valley in rainy seasons would spread over the entire valley, but that these levees on the west side of the creek obstructed the flow of the water on that side and threw it all over the east side, thereby damaging plaintiff's land and crops to the extent of $1,335, for which he sought judgment.

To this petition the defendants filed answers in which, after traversing generally the averments of the petition, they set up other meritorious defenses.

After the case had been prepared for trial, the lower court entered a judgment in favor of the plaintiff for $75 in damages, and further adjudged that the levees on the side of ditches numbers one and two obstructed the flow of the water in Lost Creek Valley to the damage and prejudice of the plaintiff, and directed that they should "take down and remove twelve inches of the top of the dam, bank or fill along the lower side of ditch number one, but in doing so they are not required to go below the general surface of the land; or they shall select a point four hundred feet from the Little Air Line road, another point seven hundred feet therefrom, another eleven hundred feet therefrom, another fifteen hundred feet therefrom, another nineteen hundred feet therefrom, or at a point or points near the places above indicated, and shall at each of said points cut out and remove all of the dam, bank levee or fill for a space of twenty feet in width down to and even with the surface of the land. And the defendants shall within thirty days from this date select which they will do. They shall either take down and remove nine inches of the top of the dam, bank or fill along the lower side of ditch number two, but in doing so are not required to go below the general surface of the land; or may select a point four hundred feet from the Little Air Line road, another seven hundred feet therefrom, another nine hundred feet therefrom, and at each of these points cut out and remove all of the dam, bank, levee or fill down to the surface of the ground for a space of twenty feet at each place, and shall have thirty days in which to elect which they will do."

In respect to ditch number three, it was adjudged that the levee at this ditch did not injure plaintiff, but the defendants were enjoined from making it any higher

than it was at the time of the judgment. The defendants were further enjoined from replacing any of the banks or fills ordered to be removed, and, in respect to what is known in the record as "the contract ditch," the defendants were enjoined from erecting any levee or fill along this ditch, but were permitted to clean the ditch out and throw the dirt for approximately twenty feet on one side and then for the same distance on the other, and so on throughout the entire length of the ditch, so that at alternate spaces on each side of this ditch there would be no levee at all.

As before stated the suit was brought not only against the individual defendants named but also against the Illinois Central Railroad Company and Union County, and it was claimed that Union County and the railroad company had also erected or taken part in the erection of levees that diverted water from its natural course, but the judgment dismissed the suit as to the railroad company and Union County. From this judgment both parties have prosecuted an appeal.

The plaintiff complains because the judgment in his favor was for only $75 when, as he insists, it should have been for the full amount sued for, and further because the judgment did not direct that the levees at ditches numbers one and two be entirely removed; or, in other words, leveled to the natural surface of the ground. He also complains of the judgment dismissing his suit against Union County. The defendants, excepting Union County and the Illinois Central Railroad Company, complain of so much of the judgment as requires them to cut down the banks or levees at ditches numbers one and two and perpetually enjoins them from making them any higher than they would be after being cut down in accordance with the judgment, and further complain of so much of the judgment as directs that in cleaning out "the contract ditch" the dirt should be thrown alternately on each side of the ditch.

It might here be noticed that the ditch known in the record as "the contract ditch" is that part of ditch number two that leads from the lands of the defendants across the fifty-acre tract of the plaintiff, on the west side of Lost Creek, into this creek. In short, it is merely a continuation of ditch number two from the lands of the defendants to Lost Creek. This "contract ditch," although it runs across the land of the plaintiff, has been

maintained by the defendants under a contract entered into in 1897 by which it was agreed that the defendants should keep open and maintain in good condition this ditch across the land of the plaintiff, thereby furnishing an outlet to Lost Creek for the water that flowed in ditch number two on the lands of the defendants.

From what has been said it will be seen that, independent of the question of damages, the real controversy concerns the levees built by the defendants, as the plaintiff does not complain about the size, location or character of the ditches.

The evidence relating to whether or not these levees throw more water on the land of the plaintiff than would naturally flow there if there were no levees, is very conflicting, and the evidence as to the height of these levees is also irreconcilable. It is also shown that this valley on both sides of Lost Creek, at the point in question, is substantially of the same level and that in time of heavy rainfall it is covered with water, is not disputed, nor is it questioned that the land in this valley would be practically worthless except for the system of ditches that has been maintained by the land owners.

The witnesses for plaintiff show that the levees along ditches one and two are from two and one-half feet to four feet high, while the witnesses for the defendants say these levees are from nine to twelve inches high. The witnesses for the plaintiff also say that except for these levees the water that comes down the valley would spread all over it in equal height, but that when the water coming down the valley reaches these levees on the west side of Lost Creek, its natural course down the west side of the creek is obstructed and the water thrown on the east side of the creek; while the witnesses for the defendants say that these levees do not affect the flow of the water and that if no levees were there the water would in its natural course run across the land of the plaintiff in the same volume and quantity that it did during the existence of the levees.

The contradictory character of this evidence given by men who had ample opportunity from actual observation to know the condition of things in this valley, makes it extremely difficult to arrive at the true state of affairs concerning the effect these levees have on the flow of the water down this valley. Reasonably and naturally it would seem that when the water flowing down on the

west side of Lost Creek came to these levees that the levees would bank the water up and cause it, after the ditches were full, to seek an outlet towards Lost Creek and on the east side thereof, thereby diverting the water that might naturally run on the west side of Lost Creek to the east side of the creek; but, on the other hand, there is a great deal of evidence going to show that the natural drainage of the water from the west side of Lost Creek is towards Lost Creek and the east side of it, and that if no levees were on the west side substantially the same volume of water would flow on the east side of the creek.

The chief trouble in this case grows out of the difficulty we have had in arriving at a correct conclusion on the facts. The law of the case is not difficult of solution. As Lost Creek is a natural stream of water running through this valley, and furnished in the natural state of things drainage for the water that fell or accumulated in the valley, the adjoining land owners had the right to drain their land so as to cause the surplus water that fell or came on their land to flow in artificial drainage into this creek: Mason v. Fulton County Commissioners, 80 Ohio State, 151, 24 L. R. A. (n. s.), 903; Mizell v. McGowan, 129 N. C., 93, 85 Am. St. Rep., 705; Lawson's Rights and Remedies, vol. 6, sec. 2942; McCormick v. Horan, 81 N. Y., 86, 37 Am. Rep., 479; 40 Cyc., 648.

And these drains the proprietors had, we think, the right to make with tile or by open ditches. But the fact that a land owner may, by artificial drainage, cause the surface water that falls or comes upon his land to be diverted into a natural stream, does not give him the right to put levees or embankments along the drainage or at other places, thereby diverting the surface water that would naturally flow on his land to the land of an adjoining proprietor, to his prejudice and injury. The limitation on the right of adjoining proprietors to control and dispose of surface water has been definitely adjudicated by this court in a number of cases.

In Pickerill v. City of Louisville, 125 Ky., 213, the principle was announced that "where two estates join, and one is lower than the other, the lower must necessarily be subject to the natural flow of surface water from the upper one. If this proves to be an inconvenience, it arises solely from the position of the lower estate, and in the nature of the case is unavoidable. Therefore, the owner of the lower ground has no right

to erect embankments, or create other obstructions, whereby the natural flow of surface water from the upper ground is stopped or caused to back upon and overflow the upper ground. On the other hand, the owner of the upper ground has no right to make excavations, barriers, or drains upon his ground by which the flow of surface water is diverted from its natural channel and a new channel made on the lower ground, nor can he collect into one channel waters usually flowing off into his neighbor's land by several channels, and thereby increase the flow upon the lower ground.'' To the same effect are: Grinstead v. Sanders, 22 Ky. L. R., 51; Stith v. L. & N. R. R. Co., 109 Ky., 168; Robertson v. Daviess Gravel Road Co., 116 Ky., 913; Jones v. Bower, 32 Ky. L. R., 450.

It will readily be seen that there is quite a difference between the drainage by artificial means of surface water into a natural stream, and the erection of levees or embankments that divert the natural flow of the surface water into a natural stream. Artificial drainage by open or closed ditches does not change the surface of the ground or impede or obstruct the flow of water on the surface, although the drains may accumulate and discharge into the natural drainage, at the point where the artificial drainage enters it, a larger body of water than would naturally flow into it at these points. But where the natural drainage is lower than the adjoining surface, artificial drains, that do not interfere with the natural conformation of the surface of the land, can not cause to be emptied into the natural drainage any more surface water than would flow into it if no artificial means were adopted, the only effect of the artificial means being to cast the water into the natural drainage at selected points.

But when banks or levees are erected, they necessarily obstruct the flow of water and necessarily divert it from its natural course to a much greater extent than would artificial drainage that did not change the surface of the soil. For example, except for the embankment along ditch number one, when this ditch became full of water by the flow of surface water into it, the surface water would naturally flow over and beyond the ditch, but the embankment on the lower side of the ditch prevents this surplus of water from following its natural course on the west side of Lost Creek, and diverts all

of the surface water that reaches this point into Lost Creek, thereby, as the evidence shows, causing Lost Creek to overflow its banks and the water therefrom to run through the land of the plaintiff on the East side of the creek.

Having these views about the law applicable to the case, we are not disposed to disturb the judgment of the lower court in respect to these ditches except in these particulars: We think the judgment, in place of allowing the defendants to elect whether they should cut down the levees at ditches numbers one and two, or leave openings at intervals in the ditches, as provided in the judgment, should have made it compulsory on the defendants to leave these openings. These openings, if made in the manner indicated in the judgment, will furnish ample room for an unobstructed flow of the water on the natural surface of the ground and thereby prevent the embankments from diverting the flow of water to the land of the plaintiff. This plan also has the advantage of giving the defendants the right to clean out the ditches and put the dirt on the levees between the openings.

In respect to the contract ditch, the judgment should be so modified as to permit the defendants, in cleaning out this ditch, to throw all of the dirt on the lower side of the ditch, but require them to leave openings of approximately twenty feet at distances of two hundred feet even with the surface of the ground, so as to permit the escape of water through these openings. In other respects the evidence is so conflicting that we have concluded to adopt the judgment of the chancellor upon these disputed questions of fact.

Wherefore, the judgment in each appeal is reversed for the modification of the judgment as indicated, each party will pay one-half of the cost on both appeals in this court.